## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ANGELINA TILLMAN, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | No. 12-1505 |
|  | : |  |
|  | : |  |
| REDEVELOPMENT AUTHORITY OF | : |  |
| THE CITY OF PHILADELPHIA, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

### MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **OCTOBER 11, 2013**

Presently before the Court is Defendant, Redevelopment Authority of the City of

Philadelphia's ("PRA"), Motion for Summary Judgment filed against Plaintiff, Angelina Tillman

("Tillman"), Tillman's Response, and PRA's Reply. For the reasons stated below, the Motion is

granted.

## I.      BACKGROUND

Tillman filed the instant Complaint on March 26, 2012, alleging unlawful age

discrimination in violation of 29 U.S.C. § 623(a)(1), and a state claim of unlawful employment

practice under 43 Pa. C.S. § 955(a). (Compl. ¶¶ 22-28.) At the time her Complaint was filed,

Tillman was a sixty-two female. (Id. ¶ 3.) PRA is a "local public agency that assists in the

planning and development of commercial and residential projects in the City of Philadelphia."

(Id. ¶ 4.) PRA receives all of its funding though the City, and the City funds PRA's operations

using money it receives from the federal government. (Defendant. Mot. Summ. J., Ex. B,

Deposition of David Thomas ("Thomas Dep.") at 12.)

Prior to her employment with PRA, Tillman was employed by the Philadelphia Housing

Development Corporation ("PHDC") from 2001 to 2006. (Id., Ex. A, Tillman Dep. at 25.) In

December 2006, PHDC laid off Tillman due to a reorganization of PHDC's real estate

department. (Id. at 29.) Tillman learned of an opening for a real estate specialist at the Office of

Housing & Community Development ("OHCD"). (Id. at 33, 46.) OHCD hired Tillman and she

worked there for four months from March 2007 until July 2007. (Id. at 42-43.) While she was

employed at OHCD, David Thomas ("Thomas"), PRA's Associate Executive Director of

Operations, approached her and asked her if she would be interested in being hired by PRA. (Id.

at 17; Thomas Dep. at 161.) Thomas informed Tillman that she would be hired as a real estate

specialist at a raise of $13,000 from her employment at OHCD.[1] (Id.) At the time Tillman began

working for PRA, there was one other real estate specialist employed there named Irma

Gonzalez-Bowie ("Gonzalez-Bowie") who was fifty years of age.[2] (Def.'s Mot. Summ. J., Ex.

E.)

As an employee at PRA, Tillman was represented by Local 1971 (the "Union"). (Tillman

Dep. at 70.) PRA and the Union are parties to a Collective Bargaining Agreement ("CBA") that

governed the terms and conditions of Tillman's employment. (Def.'s Mot. Summ. J., Ex. D.) In

2008, Tillman was elected as a union steward for the Union, and held the position for two years

---

[1]When asked at her deposition whether Thomas recruited her for the job, Tillman responded that "I don't know if I was recruited." (Tillman Dep. at 17.) Thomas, however, testified that he "recruited her from the Philadelphia Housing Authority Corporation." (Thomas Dep. at 61.) Thomas added that he never looked at Tillman's application because he knew her from her days at PHDC. (Id.) Tillman, however, does agree that Thomas informed her that she was hired by PRA. (Id. at 18.)

[2]All ages referenced are the ages as of the July 2011 layoff as detailed, infra.

until her term expired in June 2010. (Tillman Dep. at 71, 73.) In January 2010, Anthony Council ("Council") was elected president of the Union and, shortly thereafter, Council appointed Tillman to the Executive Board of the Union. (Id. at 73-74.)

Tillman asserts the following in her Complaint. On or about July 23, 2007, Tillman began her employment with PRA at age fifty-seven as a Real Estate Specialist. (Compl. ¶ 11.) She was laid off on July 22, 2011. (Id.) On that same day, Thomas met with Tillman after she received the layoff notice and, in that meeting, Thomas made age-related comments regarding her layoff. (Id. ¶¶ 12-14.) Thomas informed her that if she did not retire, she would not be eligible for medical benefits, and also stated that if she elected to receive unemployment compensation and retire later, she would lose her medical benefits. (Id. ¶¶ 14-15.) In the meeting, Thomas also asked Tillman her age, which Tillman answered was sixty-one. (Id. ¶ 16.) In response, Thomas stated that Tillman could "go right into Medicare." (Id.)

Tillman further asserts that she was a member of the Executive Board of the Union, and that under the CBA, as a union official, she had "superseniority" status which exempted her from layoff. (Id. ¶ 19.) However, Tillman claims that she was laid off in complete disregard of this status, while a younger employee was excluded from the reduction of the workforce. (Id. ¶¶ 20-21.)

PRA asserts that in early 2011, it learned that funding from the City of Philadelphia for the fiscal year 2012 would likely be significantly less than the funding for 2011. (Thomas Dep. at 58-59.) PRA states that at this time, PRA was instructed by the City's Deputy Mayor for Economic Development to begin to decide how to meet the funding reduction by conducting a preliminary analysis of vacant and filled positions that could be considered for elimination based

on the impact their elimination would have on PRA's funded operations. (Id. at 61.) Ed Covington ("Covington"), Executive Director of PRA, and Thomas conducted this preliminary analysis. (Id. at 69-70.) Covington and Thomas met with PRA's senior management team[3] to discuss potential layoffs. (Id. at 71.) The senior management team also solicited input from Departmental Directors and consulted with Tillman's supervisor, Melvis Dunbar. (Def.'s Mot. Summ. J., Ex. E at 5.) PRA also notified the Union of potential layoffs. (Id.) On April 8, 2011, Thomas sent a letter to Council stating that layoffs may become necessary, and that the Union should begin considering alternatives to layoffs so that PRA and the Union could commence preliminary discussions regarding layoffs consistent with the CBA. (Id., Ex. A-5.) Thomas testified that he did not receive a written response from Council, and in a later meeting with him discussing the reduction in funds, Council did not offer any feedback regarding layoffs. (Thomas Dep. at 104.)

On May 10, 2011, Covington sent a letter to Council informing him that PRA had been directed by the City to submit plans to reduce its expenses by 16.4%, which was in-line with the expected budget cuts, and also stating that "it would not be possible to avoid layoffs." (Def.'s Mot. Summ. J., Ex. A-6.) Council relayed this message to the Union and met with members to discuss layoffs, but did not respond to Covington's letter. (Thomas Dep. at 105.) After an analysis of the positions that could be eliminated, PRA determined that it was necessary to eliminate nineteen filled and unfilled positions. (Def.'s Mot. Summ. J., Ex. A-7.) PRA also

---

[3] In addition to Covington and Thomas, the senior management team included the following individuals: Deputy Executive Director of Real Estate, Thomas Michael Koonce (age 59); Deputy Executive Director, John Carpenter (age 50); Deputy Executive Director of Finance, Roderick Lyles (age 63); General Counsel, Nicholas Scafidi (age 63); Senior Executive Deputy Director, Nicholas Dema (age 49). (Def.'s Mot. Summ. J., Ex. E.)

determined that its work volume required only one "Real Estate Specialist III" in the real estate department.  (Id., Ex. E at 14.)  As noted, at that time, PRA employed two Real Estate Specialist III's - Tillman and Gonzalez-Bowie.  (Tillman Dep. at 89-90.)  Gonzalez-Bowie had twenty-nine years of service, and Tillman had four years of service.  (Id. at 90, 137.)  PRA asserts that in accordance with the layoff provisions of the CBA, which required that "[s]eniority shall prevail" in the situation when a position is to be eliminated and two or more employees hold that position, Tillman was laid off.  (Def.'s Mot. Summ. J., Ex. D, at Art. III § (B)(3).)

Given her options, Tillman did not want to retire, and instead, elected to be laid off, placed on the layoff list, and receive medical benefits through COBRA.  (Tillman Dep. at 113-114.)  On June 23, 2011, Thomas sent Council a memorandum that provided a list of funded bargaining unit positions into which affected employees may be eligible to be demoted.  (Def.'s Mot. Summ. J., Ex. E at 10.)  In accordance with such, on June 28, 2011, Tillman requested a demotion in lieu of a layoff.  (Id., Ex. A-17.)  Subsequently, Tillman was considered for three positions by a committee comprised of Union and management representatives, but was determined not to be qualified for any of these positions.  (Id., Ex. E at 15.)

The Union filed a grievance on behalf of Tillman regarding her layoff asserting that she was entitled to "superseniority" under the CBA due to her status as an officer in the Union.  (Def.'s Mot. Summ. J., Ex. A-18.)  A "Step II" grievance hearing was held on July 15, 2011.  (Id.)  On July 29, 2013, Thomas denied the grievance and found that under the CBA, management defined officers as only including President, Vice President, Treasurer, and Secretary.  (Id.)   In addition, chief stewards and shop stewards were entitled to this seniority.  (Id.)  On August 23, 2011, the Union filed a "Step III" grievance, but failed to take further action.

(Id., Ex. E at 8.)  The Union also filed a Charge of Unfair Labor Practices with the Pennsylvania

Labor Relations Board ("PLRB") on September 23, 2011.  (Id., Ex. H.)  However, on June 4,

2012, the Union withdrew the charge before a scheduled hearing was held.  (Id., Ex. J.)

On November 2, 2012, Tillman was offered a position with PRA in the Property

Management Division by Thomas.  (Id., Ex. A-19.)  On December 3, 2012, Tillman began

employment with the PRA as a property management coordinator in the Residential Services

Department.  (Tillman Dep. at 10-11.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper "if there is

no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

of law."  See Hines v. Consol. Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991).  The Court asks

"whether the evidence presents a sufficient disagreement to require submission to the jury or

whether . . . one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 251-52 (1986).  The moving party has the initial burden of informing the court of the

basis for the motion and identifying those portions of the record that demonstrate the absence of

a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A fact is

material if it could affect the outcome of the suit after applying the substantive law.  Further, a

dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable

jury could return a verdict in favor of the non-moving party.'"  Compton v. Nat'l League of

Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998).

Summary judgment must be granted "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Big Apple BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine issues of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III. DISCUSSION

### 1. **McDonnell Douglas Analysis**

Tillman's discrimination claim will be analyzed using the well-established McDonnell Douglas burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Briefly summarized, the McDonnell Douglas analysis proceeds in three stages. First, the plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Id. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[4] See Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 252–53

---

[4]The same general framework applies to both of Tillman's federal claim under 29 U.S.C. § 623(a)(1) and her state claim under 43 Pa.C.S. § 955(a). See Jones v. School Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999); Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156-57 (3d Cir. 1995).

(1981).  While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Id.

### A.  Prima Facie Case

Under that framework, a plaintiff must first establish a prima facie case of age discrimination by demonstrating that the plaintiff: (1) is a member of the protected class, meaning, at least 40 years of age; (2) is qualified for the position; (3) suffered an adverse employment decision; and (4) in the case of a reduction in force, other similarly situated younger employees were retained sufficient to permit an inference of age discrimination.  See Torre v. Casio, Inc., 42 F.3d 825, 831 (3d. Cir. 1994).  The United States Court of Appeals for the Third Circuit ("Third Circuit") has recognized in the case of a reduction in force, that the fourth element "is satisfied by showing that the employer retained a 'sufficiently younger' employee." Anderson v. Consolidated Rail Corp., 297 F.3d 242, 249 (3d Cir.2002).

Here, PRA states that for the purposes of this Motion, it assumes that Tillman would be able to establish that she is a member of a protected class, is qualified for the position, and suffered an adverse employment action.  (Def.'s Mot. Summ. J. at 21 n.14.)  However, PRA argues that Tillman cannot establish the fourth element of a prima facie case of discrimination because she cannot show that her separation from employment occurred under circumstances that give rise to an inference of discrimination.  (Id. at 21.)  We agree.

As noted earlier, PRA determined that its work volume required only one Real Estate Specialist in its real estate department, and at the time of the layoff, employed two specialists -

Tillman and Gonzalez-Bowie.  PRA asserts that in accordance with the layoff provisions of the

CBA, which required that "[s]eniority shall prevail" in the case where a position is to be

eliminated and two or more employees hold that position, Tillman was laid off.  (Def.'s Mot.

Summ. J., Ex. D, at Art. III § (B)(3).)  We first note that Gonzalez-Bowie had twenty-nine years

of service to Tillman's four years of service, and Gonzalez-Bowie was a member of the protected

class because she was age fifty at the time of the layoff.  Indeed, Tillman, herself, testified at her

deposition that she has no issue with Gonzalez-Bowie being retained over her regarding the

layoff.  (Tillman Dep. at 137.)  Tillman testified that it was PRA's disregard for her

"superseniority" that she believed she was entitled to as an executive board member of the Union

that was discriminatory, not its decision to lay her off instead of Gonzalez-Bowie.  (Id.)  She

testified:

> Q.  If you did not have super seniority, so assume your were not an
> executive board member- -
>
> A.  Then it would have been fine.
>
> Q.  Your layoff would not have been discriminatory.
>
> A.  It would not - - well, no.  If I didn't have the seniority, if I
> didn't have the office, then I could have been laid off and it would
> have been fine.
>
> Q.  Okay.
>
> A.  Irma [Gonzales-Bowie] has more seniority than me, she's been
> here longer than me, but because of statements that Dave [Thomas]
> made, it came down to why wasn't I given superseniority?  Is it
> because they wanted younger Irma rather than older Angie?

(Tillman Dep. at 137.)

Thus, based on this testimony, it is apparent that Tillman is not claiming that PRA's decision to lay her off instead of Gonzalez-Bowie was discriminatory. Rather, she is alleging that the decision by PRA and, in particular, Thomas that she was not entitled to "superseniority" under the CBA was discriminatory because it was based on her age.

The CBA between the Union and PRA states in relevant part:

> Effective July 1, 1993, in the event of a layoff or reduction in force and rehire, the UNION President, three additional UNION Officers, the Chief Steward, and (1) Steward for every fifteen (15) EMPLOYEES shall have superseniority. In the event of any layoff, the EMPLOYER shall have the right to rely on the last list of appointments of the UNION officials submitted by the UNION pursuant to Article II.F.2.a.(1).

(Def.'s Mot. Summ. J., Ex. D at Article II, § (C)(6).)

Tillman asserts that this Article makes clear that beginning in 1993, instead of the Vice President, Recording Secretary, and Secretary-Treasurer of the Union being entitled to superseniority, three Union officers of unspecified description would be granted superseniority. (Pl.'s Resp. Mot. Summ. J. at 10.) Tillman argues that the only reasonable explanation for the change in the CBA language, as to who was entitled to superseniority, is that the Union wanted to specify any three employees from those individuals it defined as being protected from layoffs through superseniority, and Tillman was one of these officers. (Id.) Tillman maintains, however, that to avoid this CBA provision, Thomas first claimed to not have received notice that Tillman was a member of the executive board and then interpreted the generic term "officers" to mean Vice-President, Recording Secretary or Secretary-Treasurer, effectively re-writing the CBA so

that Tillman would be laid off.  (Id.)

PRA responds that the plain language of this Article does not include executive board members in the group of "Union Officers."  (Def.'s Mot. Summ. J. at 25.)  Thus, because executive board members are not mentioned in this relevant section of the CBA, PRA determined that Tillman was not entitled to "superseniority" when it made its decision to lay her off under the procedures set forth in the CBA.  (Id.)  Thomas testified that Tillman was not entitled to "superseniority" because: (1) the language of the CBA does not include executive board members  (Thomas Dep. at 140-141); (2) the Union never provided PRA with notice that Tillman was entitled to superseniority under the CBA  (Id. at 127); and (3) PRA had not given superseniority status in previous layoffs involving executive board members.[5]  (Id. at 140.)

We again point out that Tillman's burden is not to establish that PRA's, and specifically, Thomas' decision that she was not entitled to superseniority was an error in interpretation of the CBA, but that the decision was based on age discrimination.  Tillman's assertion that Thomas discriminated against her because of her age is largely based on a conversation she had with him at a meeting after the decision was made to lay her off.  Regarding the meeting, Tillman testified as follows:

> Q.  Did he [Thomas] ask your age in the meeting?

---

[5]Thomas testified that in 2004, Debbie Whitehead ("Whitehead") was laid off while she was a member of the Union's executive board.  (Thomas Dep. at 149.)  Thomas also testified that Whitehead herself was of the opinion that executive board members are not officers of the Union.  (Id. at 150-51.)  It is notable that Tillman does not dispute in her Response that Whitehead was an executive board member who was not given superseniority status during a previous layoff.

A.  Then he said, "Well, how old are you?"  And when I told him, and then he continues on, "Well, you know you can go right into Medicare," and this and that.  But age is part of the HR records, and he had to have the HR information before the meeting, so he knew how old I was.

Q.  Did he tell you he knew how old you were or are you assuming that he looked at the HR records?

A.  I know he looked at the HR records to tell me that I was eligible for retirement because of my age where I could get retirement and not be 55 or wait five years.

Q.  Do you know what he meant by going right into Medicare?

A.  No.

Q.  What do you think he meant?  At the time what did you think he meant?

A.  Well, I thought he meant that you're old enough to retire.  You don't have to come back.  You go into Medicare.  Take the five years we're offering you.  And it was all an insinuation of age.  That's how I took it, and that's what he said.

He didn't offer me or tell me about the layoff and the layoff list, which is part of it too.  He didn't mention one thing about that.  If I had not been familiar with the union contract, I wouldn't have known that.

And when I mentioned that I wanted the layoff, he said, "You won't be back."

I don't know what he meant about that or why he meant it.  I had good evaluations, I was a productive employee, so what did he mean by it?

Q.  What do you think he meant by it?

A.  For some reason, he wanted me to retire, and I felt he was

forcing retirement on me.

(Tillman Dep. at 110-113.)

Tillman asserts that Thomas' inquiry about her age and his statement to her that she could "go right into Medicare" support her claim of age discrimination. However, we first note that several courts, including a court in our district, have held that "company officials are permitted to gather information relevant to personnel planning without raising the specter of age discrimination." See Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 100 (1st Cir. 2002); see also Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees"); Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct"); see also Folcher v. Appalachian Insulation Supply, Inc., No. 06-4623, 2007 WL 1544693, at *3 (E.D. Pa. May 24, 2007).

Here, at the time of the meeting with Thomas, the decision had already been made that Tillman was to be laid off, and we are of the opinion that Thomas did not make any statement or comment at this meeting that would indicate that he desired her to retire or was forcing her into retirement in any way. We find that the record establishes that Thomas' inquiry about Tillman's age and his statement that she could "go right into Medicare" were not made for any reason other than to assist or aid Tillman in making an informed decision about her future. Regarding his meeting with Tillman, Thomas testified as follows:

13

Q. Okay. And what is your recollection as we sit here today what happened during your meeting with Ms. Tillman?

A. The standard meeting that I had with everybody. Basically, as a Bargaining employee, notified Ms. Tillman of her rights as a Bargaining employee, her right being her ability to request a demotion in lieu of layoff. If that is not granted, she unfortunately would be separated from service at the Redevelopment Authority. She would be eligible for unemployment benefits.

We were also setting up some career opportunity training sessions to help folks become more marketable, if you will.

And with her, she would be going over the layoff list and the rehire list if she chose to go on unemployment.

Then consequently, I asked Ms. Tillman, by the way, her age. And she said she was 61. I indicated at that time, I probably even showed her a sign of surprise, quite honestly because I didn't know her age but I was pleasantly surprised that she was 61 because that meant that she would not be without health insurance if she elected to retire. She would have been eligible, at minimum, to retire from the Redevelopment Authority, to collect a small pension but to preserve her health insurance.

(Thomas Dep. at 158-159.)

As a result of the meeting with Thomas, Tillman sent a letter to Thomas stating that she felt as though she was being forced into retirement and the Union's contract was being disregarded. (Def.'s Mot. Summ. J., Ex. A-11.) Tillman stated in the letter that "[y]ou asked me what my age was and when I said 61 you stated that I could go 'right into Medicare.' Since all of my personal information is available to you and you should have known my age, this made me feel very uncomfortable and as if I was the object of discrimination." (Id.) In response, Thomas sent Tillman a letter clarifying that the purpose of the meeting was to discuss her options. (Id., Ex. A-12.) Thomas wrote:

> Let me first begin by clarifying that the purpose of the meeting on
> June 22, 2011 was to apprise you as I've done with all affected
> employees what your options were. During this meeting I
> informed you that as a bargaining unit employee you may have the
> option of requesting a demotion in lieu of layoff and, depending
> upon your tenure and age, other options may be available. It was at
> that time that I asked you what your age was so that I may better
> inform you of those options. At no time prior to you indicating
> your age was I aware of your age. I never stated or implied that
> because you are 61 you could go "right into Medicare." What I
> said was based on your years of service here at the Redevelopment
> Authority and your age should you elect retirement you qualified as
> a normal retiree and would be entitled to 5 years of basic health
> plan coverage (pursuant to the collective bargaining agreement)
> and that after the 5 years was exhausted you may be 'eligible to go
> right into Medicare.'

(Id.)

A plaintiff's own unsubstantiated, subjective beliefs or suspicions alone would not suffice

to persuade a rational trier of fact that age was a factor in the termination decision. See Rizzo v.

PPL Serv. Corp., Nos. 03-5779, 03-5780, 03-5781, 2005 WL 913091, at *11 (E.D. Pa. Apr.19,

2005); see also Taylor v. Cherry Hill Bd. of Educ., 85 F. App'x 836, 839 (3d Cir. 2004) ("In the

context of discrimination claims, we have explained that conclusory allegations of

discrimination, in the absence of particulars, are insufficient to defeat summary judgment"); Frost

v. PetSmart, Inc., No. 05-6759, 2007 WL 602990, at *5 (E.D. Pa. Feb. 26, 2007); Martin v.

Healthcare Bus. Res., No. 00-3244, 2002 WL 467749, at *6 (E.D. Pa. Mar. 26, 2002)

("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her

race, gender and age is not a substitute for competent evidence").

Here, as explained above, we opine that Tillman's beliefs that Thomas discriminated

against her because of her age are unsubstantiated by the record. Accordingly, we find that

Tillman has failed to establish an "inference of discrimination" in order to satisfy the fourth element of a prima facie case of age discrimination. See Torre, 42 F.3d at 831. However, we further determine that even assuming that Tillman could establish a prima facie case, we find that Tillman's age discrimination claim fails under the remaining McDonnell Douglas analysis.

**B. Legitimate Nondiscretionary Reason for Layoff**

We now move to the second part of the McDonnell Douglas test. If a plaintiff is successful in making out a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection." Jones, 198 F.3d at 410, (citing McDonnell Douglas, 411 U.S. at 802). The employer's burden is satisfied by simply explaining its actions or producing evidence of a legitimate nondiscriminatory reason. Texas Dep't of Cmty. Affairs, 450 U.S. at 255. This burden is merely one of production, not one of persuasion. Id. at 256–258. Defendant's explanation of its legitimate reasons must be clear and specific. Id. at 258. We find that PRA meets this burden.

Courts in this Circuit have held that seniority provisions in collective bargaining agreements can provide legitimate, nondiscriminatory reasons for employer action. See Williams v. N.J. Trenton Psychiatric Hosp., No. 07-4154, 2009 WL 405640, at *3 (3d Cir. Feb. 19, 2009); Mills v.. Phila. Gas Works, No. 06-2444, 2007 WL 2071881, at *4 (E.D. Pa. Jul. 19, 2007).

In this action, PRA asserts that Tillman was laid off in accordance with the layoff provisions of the CBA, which required that "[s]eniority shall prevail" in the case of a situation when a position is to be eliminated and two or more employees hold that position. (Def.'s Mot.

Summ. J., Ex. D, at Art. III § (B)(3).)  Accordingly, because PRA has set forth a "legitimate, nondiscriminatory" reason for its decision to terminate Tillman's employment, it has met its burden at this step of the analysis.

**C. Pretext**

Finally, because PRA has carried its burden, Tillman must prove by a preponderance of the evidence that the legitimate reasons offered by PRA were a pretext for discrimination.  Jones, 198 F.3d at 410.  "Most cases turn on this third step, i.e., whether plaintiff can establish pretext." Id.  "At this point the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination."  Id. at 412.  "At trial, the plaintiff must convince the finder of fact both that the reason was false, and that the discrimination was the real reason."  Id. at 412–413 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

A plaintiff may defeat a motion for summary judgment by pointing to some evidence from which a reasonable factfinder would either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  Jones, 198 F.3d at 413.  This gives plaintiff two possible avenues to defeat a motion for summary judgment.  "Plaintiff cannot simply show that the employer's decision was wrong or mistaken . . .  rather, the nonmoving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  Fuentes v. Perskie, 32 F.3d 759, 765

(3d Cir. 1994). "Plaintiff also may survive summary judgment by pointing to evidence in the record which 'allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Jones, 198 F.3d at 413 (quoting Fuentes, 32 F.3d at 764).

Tillman maintains that the record establishes "weakness[es], implausibilities, inconsistencies, incoherencies, and contradictions" in PRA's proffered legitimate reason. Fuentes, 32 F.3d at 765. Tillman claims that "[c]ontrary to PRA's position that there is no evidence of age discrimination in the record, Council's testimony provides direct evidence that the termination of Tillman's employment was the result of Thomas' bias against and animus toward older workers."[6] (Pl.'s Resp. Mot. Summ. J. at 6.) Tillman asserts that according to Council, a PRA employee, Mark Nekoraniik ("Nekoraniik"), a forty-nine year old male applied for a job opening for a position as an Accounting Supervisor, but was not put on the lists of applicants until the Union filed a grievance. (Id.) Council testified that another PRA employee, Kenneth Demby ("Demby"), a forty-eight year old black male, also applied for this position and was "ranked" for the job, but PRA ultimately selected Darren Williams ("Williams"), a thirty-six year old male for the position. (Id. at 6-7.) After learning that Williams had been selected for the position, Council testified that he spoke with Thomas about why Nekoraniik or Demby, both of whom had greater seniority than Williams and whom Council considered to be more highly qualified, were not

---

[6]Tillman states that "[t]he first and most obvious reason that PRA's explanation of why Tillman was fired is untrue is Thomas' animosity towards and disdain of older workers, as expressed to Council within weeks of Tillman's layoff, as well as Council's observations of Thomas harassing Tillman." (Pl.'s Resp. Mot. Summ. J. at 9-10.) In her Brief, Tillman cites the deposition of Thomas at pages 66 through 69 to support this statement. (Id. at 10 n.23.) However, a review of these deposition pages does not support this statement, nor do the pages seem related to this statement in any way.

selected.  (Council Dep. at 148-149.)   Council testified:

> Q.  Okay.  And did you speak with Mr. Thomas about that issue also when you spoke to him about Mark [Nekoraniik]?
>
> A.  Yes.  I did.
>
> Q.  Okay.  And what, if anything, do you recall Mr. Thomas saying about Mr. Demby?
>
> A.  Okay.  What Mr. Thomas said to me about Mr. Demby as I recall, we had a discussion, and I said, well, you know, then– if you're not going to give it to Mark, then the next person on the list is Kenneth, I said Kenneth.  And then he said, Well, you know- well, if we put Kenneth in there, what do you think how it's going to look?  He said, because all of the senior individuals in that department are black.  I said, then, since Mark is at the top of the list and should get the job and qualified, then put Mark in the job.  And he went back to Mark, you know, he's too old, he's been here too long, his knowledge and stuff is, you know, out of date.

(Council Dep. at 148-149.)

In order to establish pretext, a plaintiff may show that the employer has previously discriminated against plaintiff, or others in plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.  See Jones, 198 F.3d at 413.  Here, however, we do not find that Council's deposition testimony establishes that Thomas had a "bias and animus toward older workers."[7]  We first note that Nekoraniik was not a similarly situated employee as Tillman.  Thomas' alleged isolated statements concerning Nekoraniik being too old involved candidates for promotion and not a layoff.  In addition, the

---

[7]We note that there is no issue of race discrimination in this matter.  Accordingly, we only consider Council's testimony regarding Thomas' alleged comment about Nekoraniik.

statements did not involve the application of the seniority process of the CBA, nor the applicability of the status of "superseniority" to executive board members of the Union.[8]

Moreover, Thomas' history with Tillman is inconsistent with him having a "bias and animus toward older workers," especially Tillman. As noted earlier, Thomas recruited Tillman from OHCD to PRA when Tillman was fifty-seven years old and was in the protected class.[9] (Thomas Dep. at 61.) The Third Circuit has explained that such evidence, "while not dispositive, may be relevant to demonstrate that discrimination did not play any part in an employer's termination decision." See Waldron v. SL Indus., Inc., 56 F.3d 491, 496 n.6 (3d Cir. 1995); see also Glenn v. Raymour and Flanigan, 832 F. Supp. 2d 539, 551 (E.D. Pa. 2011). We also note that Thomas later hired Tillman again when she was sixty-three years old. On November 2, 2012, Thomas offered Tillman a position with PRA in the Property Management Division which was accepted by Tillman. (Def.'s Mot. Summ. J., Ex. A-19.) Moreover, as discussed earlier, Thomas' testimony regarding his meeting with Tillman and his response letter to her regarding the meeting further indicates that Thomas did not have a "bias and animus toward older workers" and in particular, Tillman.

Tillman also asserts that "one more weakness and inconsistency in PRA's explanation for her layoff is contained in PRA's explanation of the process allegedly used to select the employees

_____

[8]It is notable that the Union, under Council as its President, filed a grievance and a charge of unfair labor practices with the PLRA, each alleging that PRA violated the CBA by failing to recognize Tillman's superseniority. However, after Council left office, the Union withdrew the PLRA's charge, and has failed to process the grievance beyond step 2. (Def.'s Mot. Summ. J., Exs. A-18, E, H-J.)

[9]As noted earlier, Tillman does not totally agree that Thomas "recruited" her from OHCD. (Tillman Dep. at 17.) However, she does agree that Thomas informed her that she was hired by PRA. (Id. at 18.)

to be laid off." (Pl.'s Resp. Mot. Summ. J. at 11.)  Tillman states that in response to interrogatories, PRA describes an allegedly "objective" procedure of identifying "positions" to be eliminated which was unconnected to the individuals occupying those positions.  (Id.)  Tillman argues, however, that Thomas' deposition testimony paints a very different picture of the process in that it makes clear that, in 2011, layoffs were not determined by position, but by individual. (Thomas Dep. at 79-82.)  Tillman claims that Thomas and PRA's senior management were "fully familiar with the seniority provisions of the CBA and quite willing to manipulate or re-write those provisions so that PRA could keep people it wanted to keep and get rid of the people it did not want to keep (i.e., older workers) during the reduction in force."  (Pl.'s Resp. Mot. Summ. J. at 13.)

We, however, disagree.  A reading of the portion of Thomas' deposition testimony that Tillman refers to indicates that Thomas responded to a number of hypothetical questions, and we do not agree that Thomas' answers to such makes it "abundantly clear" that layoffs were not determined by position, but by the individual.  We are of the opinion that a reading of Thomas' entire deposition testimony supports PRA's assertion that its decision to lay off one of the Real Estate Specialist's position and Tillman herself was not based on age.

Therefore, we find that this action does not survive summary judgment because Tillman has failed to establish "inconsistencies" and "contradictions in the employer's proffered reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765.  Accordingly, we grant PRA's Motion for Summary Judgment.

An appropriate Order follows.